WILLIAM A. JONES v. STATE.

No. A-10683.    April 2, 1947.

(179 P. 2d 484.)

Harold McArthur, of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Owen J. Watts, Asst. Atty. Gen., and Dixie Gilmer, Co. Atty., of Tulsa, for defendant in error.

BAREFOOT, P. J.  Defendant, William A. Jones, was charged jointly with Raymond Houser and Glenn V. Gunter in the district court of Tulsa county with the crime of robbery with firearms. He was granted a severance, tried, convicted and sentenced to serve a term of 30 years in the State Penitentiary, and has appealed.

For a reversal of this case, it is first contended that the "verdict and judgment thereon is contrary to the evidence."

This contention is based upon the proposition that the evidence made out a case of conjoint robbery, or larceny from the person, but did not support a conviction of robbery with firearms. This contention makes it necessary to give a short review of the evidence. However, we desire to set out certain sections of the Oklahoma statutes before reviewing the facts.

Tit. 21 O. S. 1941 § 791 defines robbery as follows:

"Robbery is a wrongful taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

Tit. 21 O. S. 1941 § 792 refers to the employment of force or fear, and is as follows:

"To constitute robbery, the force or fear must be employed either to obtain or retain possession of the property, or to prevent or overcome resistance to the taking. If employed merely as a means of escape, it does not constitute robbery."

Section 793 of the same Title provides:

"When force is employed in either of the ways specified in the last section, the degree of force employed is immaterial."

Section 794 defines what fear is an element:

"The fear which constitutes robbery may be either:

"1. The fear of an unlawful injury, immediate or future, to the person or property of the person robbed or of any relative of his, or member of his family; or,

"2. The fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed, at the time of the robbery."

Tit. 21 O. S. 1941 § 800 defines conjoint robbery:

"Whenever two or more persons conjointly commit a robbery or where the whole number of persons conjointly commits a robbery and persons present and aiding such robbery amount to two or more, each and either of such persons is punishable by imprisonment in the penitentiary for not less than five years nor more than 50 years."

Tit. 21 O. S. 1941 § 801 defines robbery with firearms or dangerous weapons, and is as follows:

"Any person or persons who, with the use of any firearms or any other dangerous weapons, attempts to rob or robs any person or persons, or who robs or attempts to rob any place of business, residence or banking institution or any other place inhabited or attended by any person or persons at any time, either day or night, shall be guilty of a felony, and, upon conviction therefor, shall suffer punishment by death, or imprisonment, at hard labor, in the State Penitentiary, for a period of time of not less than five years, at the discretion of the Court, or the jury trying the same."

Tit. 21 O. S. 1941 § 1701 defines larceny:

"Larceny is the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof."

Section 1708 defines grand larceny in the night time from the person, and fixes the punishment therefor:

"When it appears upon such trial, that such larceny was committed by stealing in the night time, from the person of another, the offender may be punished by imprisonment in the penitentiary was exceeding ten years."

The evidence was that Miss Mary Irene Henry, whose home was in Chelsea and who was attending the University of Oklahoma at Norman, was visiting in the home of Miss Norma Kenworthy who lived at 1505 South Elwood, in Tulsa, on Friday evening, October 13, 1944. They left the home of Miss Kenworthy about 7:45 in the evening, and in company with Miss Pat Stephens were waiting on the corner for a bus to town. Miss Henry had stopped in Tulsa on her way to Chelsea, and it was their intention to go first to the railway station and check her luggage, as she intended to catch a 11:30 train to Chelsea, and then attend a picture show. While they were standing at the corner, waiting for the bus, three parties, who were afterwards identified as the three defendants, came by in an automobile, and one of the occupants asked the girls if they wanted to ride to town. Miss Kenworthy testified that she was often picked up at this corner and given a ride to town, and that the three girls entered the automobile, about 7:45. Miss Henry and Miss Kenworthy got in the back seat, and Miss Stephens in the front seat. Defendant was identified as being the driver of the automobile, and the codefendant, Gunter, was in the front seat with him, and the other codefendant, Houser, was in the back seat. They drove for several blocks, and the young ladies "kept telling them to turn to the right to take us to the train station." Miss Henry testified that defendant was driving the car, and positively identified him. She testified:

"Q. As you were going out there, did any of these three defendants, Jones, Gunter or Houser, make any statement to you?  A. Yes, sir, Gunter had a gun and said, 'this is a robbery.' * * *  Q. I will ask you if this defendant Jones, did he have anything in his hand?  A. Yes, sir. Q. What was it?  A. He had a gun.  Q. Did you see the gun?  A. Yes, sir.  Q. Did anybody take any money away from you?  A. Yes, sir.  Q. Who was it?  A. Gunter took

my billfold. Q. How much money did he take from you? A. About two or three dollars. Q. Did Jones take any money off of you? A. No, sir."

She testified that they had stopped the car and required each of the girls to get out of the automobile.

"Q. Did they look through your bag or not? A. Yes, sir, Houser searched it. Q. Tell us what he did with the bag. A. He just looked through it, saw there wasn't anything very valuable, so he didn't take anything. * * * A. We drove around in the country for two and a half or three hours. * * * Q. Just tell what they did. Did you stop any more? A. Yes, we would drive along, then stop, get out, they would search us, then we would get in, drive on. That went on for about two and a half or three hours."

She testified that they finally brought them back to the Midland Valley railroad tracks about 11 o'clock, and that she got a taxi and went to the train station and took the train to her home in Chelsea. She did not see the defendant William Jones again until the preliminary examination was held several months later. She at that time, and at the trial, positively identified the defendant as the party who drove the automobile, and who had the pistol in his hand at the time he searched her on the night of October 13, 1944.

Miss Kenworthy testified for the state. Her testimony corroborated that of Miss Henry as above stated. She also testified:

"Q. Where did you go? A. We continued up Denver and when we got to the place that we should turn, they did not turn, kept going straight; so I told them they were supposed to turn to the right, and Jones said, 'I know where I am going', so we kept going straight, finally he turned to the right. Q. That was Jones, this defendant here, is that right? A. Yes, sir * * * Q. Did you see any guns or revolvers? A. Yes, sir. Q. Did this man here,

Jones, have a gun? A. Yes, sir. Q. Whereabouts was it? A. He had it in his hand when I first saw him. Q. Did anybody tell you it was a robbery? A. They did, after we turned to the left—let's see, we were going this way, then we turned to the right. Q. Who made that remark? A. Gunter. Q. When you stopped out there, what took place? A. Well, when we first stopped, Houser told me to get out, because Irene's bag was in the back seat, and I got out and just before I got out, they turned on the dome light, then they made me turn my back to the car, some one searched the bag. I had my back to the car at the time. Q. Was there any money taken away from you? A. Yes, sir. Q. Who took the money? A. I handed my billfold to Houser on the way out there, and told him to take our money and let us out, if that is what he wanted, and he said no, he would not do it. Finally he handed it back to me and Gunter took it. Q. How much money did you have? A. Oh, about six or seven dollars. Q. Did they take all your money? A. Well, they missed about fifty cents. Q. How did they happen to do that? A. It was in a zipper compartment of my purse. Q. Zipper compartment of the purse? A. Yes, sir. Q. They got all but that? A. Yes, sir. Q. After they stopped, did you get back in the car? A. Yes, sir. Q. Then where did you go? A. We just went up the road and turned down another one, they made us get out again. Q. What would they do when they would make you get out? A. They just said, 'get out.' They had a gun, and you don't argue with a gun. Q. You got out? A. Yes, sir. Q. Did they tell you to get back in? A. Yes, sir. Q. And you got back in? A. Yes. Q. About how long were you with these three men? A. From a quarter of seven until almost 11 o'clock. Q. Miss Kenworthy, during this some two and a half or three hours' time, did you have an opportunity to see the driver of the automobile. A. Yes, sir. Q. Can you tell us at this time whether or not this man here, sitting in the court room, William Jones, is the man who was driving that automobile? A. I am sure it is. Q. Are you absolutely positive? A. Yes, sir."

She testified to seeing the defendant at the police station about a month later, and that she picked him out from a number of persons as the one who drove the automobile on October 13, 1944.

At the time of the trial, Miss Stephens had moved to California, and she did not testify.

Certain police officers of the city of Tulsa testified that they were "cruising" in the city on Saturday night, October 14, 1944. That they were looking for a stolen automobile of which they had the description, and the license plate was missing. They saw a car answering the description, and after a chase they captured the codefendants Gunter and Houser, who fled from the car. A third party ran and escaped. Defendant was arrested by the police officers about a month later, and was taken to the city jail. Miss Kenworthy was recalled, and she testified that she was called to the city police station and identified the car in which Gunter and Houser were arrested as being the car used in the robbery on the night of October 13, 1944.

Defendant placed upon the witness stand three witnesses for the purpose of establishing an alibi. Among these were a brother of the defendant, and the brother's mother-in-law. They both testified that during the week of October 13, 1944, and on the 14th, defendant and his wife, with his brother and his wife, went to visit the brother's mother-in-law in Hominy, Okla. That defendant was there on Saturday night, October 14, and they returned to Tulsa on Sunday night, October 15, 1944. The brother could not testify positively as to the whereabouts of defendant on Friday night, October 13, 1944, the night of the alleged robbery, but he was of the opinion that his brother was with him on that night because: "I and my brother are inseparable."

The state offered in rebuttal one witness, a police officer, who testified that the brother of defendant was taken to the police station on Tuesday following Friday, October 13, 1944, and questioned as to the whereabouts of the defendant, and that his brother stated he "didn't know where Bill was, and haven't seen him for approximately a week, and that he would bring him in to the police station whenever he saw him."

Both sides rested, and defendant did not testify, as was his right.

To support the contention of defendant, he cites the cases of Cannon v. State, 71 Okla. Cr. 42, 107 P. 2d 809, and Edwards v. State, 55 Okla. Cr. 110, 25 P. 2d 800.

It is unnecessary to review these cases, only to state that they have been carefully considered, and they sustain the position of the state in every particular. They were both cases where the defendants were charged with robbery with firearms under the identical statutes above quoted, and under which defendant was charged. Both cases were affirmed and the facts in those cases were very similar to the facts here presented.

In the case of Ross v. State, 31 Okla. Cr. 143, 237 P. 469, 470, this court had under consideration the same question here presented, and it is there said:

"It is here contended that the testimony is insufficient to support the verdict, for the reason that there is no sufficient proof of force or fear in the taking of the money. That there was no force employed, and, as the witness Faye Godsey testified that the two men who came into the bank told her that they were not going to hurt her, did not threaten her, and as she was not afraid of them, there is not a sufficient proof of fear. This witness testified that she was not afraid of the men so long as she did what they

told her to do, and that she turned the money over to them because their guns were in evidence. This, defendant contends, may prove a case of larceny, but not robbery, citing Monaghan v. State, 10 Okla. Cr. 89, 134 P. 77, 46 L. R. A., N. S., 1149, and Nelson v. State, 11 Okla. Cr. 259, 145 P. 315. This witness displayed great poise and coolness under the circumstances. She apparently was imbued with the idea that the persons who came into the bank, pointing a gun at her, with the command 'stick 'em up,' were after the money in the bank, and that if they could procure the money there would be no reason to hurt her. This is common sense. She also apparently realized that, if she attempted to resist, violence sufficient to overcome her resistance would be made. What fear or degree of fear is sufficient to constitute robbery is not a new question. It has been held that, if there is an assault which would furnish a reasonable ground for fear, the robbery is complete. First Bishop (9th Ed.) § 438 (2); Tones v. State, 48 Tex. Cr. 363, 88 S. W. 217, 1 L. R. A., N. S., 1024, 122 Am. St. Rep. 759, 13 Ann. Cas. 455.

"In State v. Lamb, 141 Mo. 298, 42 S. W. 827, it is held:

" 'Where an indictment charges a robbery to have been done violently and against the will, actual fear on the part of the person from whom the property was taken need not be proved, but will be presumed.'

"See, also, State v. Kennedy, 154 Mo. 268, 55 S. W. 293.

"In this case it was not essential to constitute robbery that the custodian of the money taken become hysterical and believe that she would meet death if she failed to immediately respond to the demands made. It is sufficient if the demand, with the display of firearms as shown by the evidence, cause her to stand aside and permit the money in her custody to be taken in the manner disclosed by the evidence. The delivery or taking the money is not rendered voluntary because the witness did not see fit to endanger her safety by attempting to resist. A threat may

be made and be just as potent by some act or gesture as if made by words; and fear in a legal sense may result from such threat, although the person threatened may maintain composure. A defendant will hardly be heard to say that, by holding up another at the point of a gun, and taking property from his person or immediate presence, he is not guilty of robbery, merely because the person robbed was able to exercise self-control."

There is no question but that the defendant in this case was properly charged with robbery with firearms. He could have been charged under the statute with conjoint robbery, but we have often held that one committing a crime may violate more than one statute, and it is within the discretion of the county attorney to determine under which statute charges will be preferred. We will here remark that the county attorneys should be careful in selecting the statute under which charges are filed, and this is especially true in robbery cases. We are of the opinion that the statute with reference to robbery with firearms was enacted by the Legislature to cover cases where the crime was more aggravated, and especially where banks or other places of business had been robbed, or where individuals have been killed or severely injured. This was the reason for providing that the death penalty or life imprisonment could be imposed if the facts justified. It will be noted, however, that this statute provides for a minimum penalty of not less than five years, and with this equalization there is not much difference in the punishment to be assessed for robbery with firearms and conjoint robbery.

The defendant questions the right of the court to give instruction No. 7, and the court's refusal to instruct upon the question of conjoint robbery.

Instruction No. 7 was an instruction under the statute of robbery with firearms. This contention has been dispos-

ed of above, in the consideration of the evidence at the trial. It may be further noted that no exception was taken to instruction No. 7, and that no requested instructions were offered by defendant.

As to defendant's contention that certain evidence was immaterial and prejudicial, we do not find that defendant was prejudiced by such testimony.

This brings us to the next question presented: That under the facts in this case the judgment and sentence of this defendant to a term of 30 years in the penitentiary is excessive.

We have carefully considered the cases cited by defendant: Armstrong v. State, 61 Okla. Cr. 352, 68 P. 2d 114; and Baker v. State, 64 Okla. Cr. 169, 78 P. 2d 320.

Each case must stand on its own record as to whether it is excessive under the facts, and as to whether some action in the trial of the case has caused the jury to render a verdict which would justify the conclusion that the same was rendered under passion or prejudice. The verdict of the jury and judgment of the court will not be modified unless some of the facts above stated exist and justice requires that relief be given. This court only acts as justice demands. The Governor of the state, acting upon the recommendation of the Pardon and Parole Board as the law now exists, can only extend mercy.

The record in this case does not reveal the disposition of the case against the two codefendants, Gunter and Houser. There was no appeal to this court from any judgment and sentence which they received. We have taken the liberty to examine the files in the office of the Pardon and Parole Board, and find that these parties entered pleas of guilty, and were each sentenced by the court to serve

a term of seven years in the penitentiary, which they are now serving. This record further reveals that the codefendant Gunter had in 1931 been convicted of the crime of manslaughter in Canadian county, and was sentenced to serve a term of 40 years in the State Penitentiary. He was granted a 60 day leave of absence in 1944, and while on this leave of absence was convicted of committing this crime of robbery with firearms in Tulsa county, and received a seven-year sentence. It is also revealed by the record that he was convicted in Canadian county in 1939 of the violation of the Dyer Act, 18 U. S. C. A. § 408 (transporting a stolen automobile across the state line) and was sentenced to a term of 30 months in a Federal prison, and that he was paroled thereon.

The records in the Pardon and Parole Board also reveal that the codefendant Houser was convicted in Tulsa county in 1943 of the crime of assault to rape, and sentenced to serve 15 months in the State Penitentiary, and that he was paroled in August, 1944.

The record of the defendant is that he was charged in Tulsa county with the crime of larceny of an automobile in three separate cases in 1941. That he was sentenced to serve a term of five years in each of the three cases, the terms to run concurrently. He was discharged from the penitentiary in June, 1944.

It will be noted that each of the three defendants have bad records. These records will only be considered with reference to the question of whether the punishment assessed against the defendant, Jones, in this case is excessive. The two codefendants, Gunter and Houser, entered pleas of guilty, and were sentenced by the court to serve seven years in the penitentiary. The defendant was tried and a jury assessed the punishment at 30 years. There is

a great discrepancy in the punishment assessed. The facts do not show that any one of the parties was more guilty than the other. No one was physically injured in the commission of the robbery. The defendant, Jones, was convicted upon the testimony of Miss Henry and Miss Kenworthy who both positively identified him a month after the crime had been committed, and also at the trial. This is all of the evidence connecting him with the commission of the crime. Under these facts and circumstances, it occurs to us that justice demands that the sentence of 30 years in the State Penitentiary assessed against this defendant is excessive, and that justice demands a modification of this judgment and sentence to a term of 10 years in the State Penitentiary.

It is, therefore, ordered that the judgment and sentence of the district court of Tulsa county be modified from 30 years in the State Penitentiary to a term of 10 years in the State Penitentiary.

JONES and BRETT, JJ., concur.